UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | |
|---|---|
| GEORGE RAY TRUSSELL, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) Case No. 1:09-cv-322 |
| v. | ) |
| | ) Judge Mattice |
| CITY OF DECHERD, HAROLD PERRY, *in* | ) |
| *his individual and official capacities*, and | ) |
| JOHNNIE ETHERIDGE, *in his individual* | ) |
| *and official capacities*, | ) |
| | ) |
| *Defendants*. | ) |

## <u>MEMORANDUM AND ORDER</u>

Presently before the Court is Defendants' Motion for Summary Judgment (Doc. 16)

("Motion" or "MSJ"), filed on February 15, 2011, together with a Memorandum in Support

(Doc. 17) ("MSJ Mem."), a Statement of Material Facts (Doc. 18), and excerpts from

Plaintiff's July 14, 2010 deposition (Doc. 19). On March 18, 2011, Plaintiff filed his

Response to Defendants' Motion for Summary Judgment (Doc. 23) ("Respon."), together

with twenty-four exhibits in support, including the complete transcripts of the depositions

of Plaintiff (Doc. 23-1) ("Trussell Dep."), Defendant Perry (Doc. 23-9) ("Perry Dep."), and

Defendant Etheridge (Doc. 23-22) ("Etheridge Dep.") and the exhibits attached thereto.

Finally, on March 25, 2011, Defendants filed their Reply Brief (Doc. 24) ("Reply"). For the

reasons explained below, Defendants' Motion for Summary Judgment (Doc. 16) will be

**GRANTED**.

## I.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 permits a party to move for summary judgment

– and the Court to grant summary judgment – "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586; Fed. R. Civ. P. 56). The nonmoving party must present

sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248-49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)). *See also*, *White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475-76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374.

The Court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id.* at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment the Court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252-53.

Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id.* at 327.

## II.    FACTUAL BACKGROUND

The facts, viewed in the light most favorable to Plaintiff, are as follows. The instant action arises out of the circumstances surrounding Plaintiff's employment with – and termination of the same by – the City of Decherd, Tennessee as a member of the Decherd Fire Department. (Compl. ¶¶ 10-11.) Plaintiff worked at the Fire Department for four years, first as a volunteer and then as a full-time employee after he was hired in October of 2007. (Doc. 23-1 Trussell Dep. 12:1-4, 36:5-15.) Defendant Perry was the Fire Chief the entire time Plaintiff worked there. (Trussell Dep. 28:4-7.)

### A.    Plaintiff's Injury, Absence, Suspension, and Dismissal

On Wednesday, May 13, 2009, Plaintiff injured himself in a non-work related incident. (Compl. ¶ 15.) After he was released from the emergency room around 9:00 or 10:00 p.m., he went to the fire hall and notified his immediate supervisor, Capt. Eric Bohanan, of the injury and informed him that he was going to try to get a doctor's appointment Thursday or Friday. (Compl. ¶ 16; Trussell Dep. 63-64.) The next morning, Thursday, May 14, 2009, Plaintiff went to the fire hall and notified Defendant Perry – the Fire Chief and "personal representative of the City as an appointed head of the department responsible for the administrative and operational oversight of the department" – of his injury and that he would need to be out; Perry "directed Plaintiff to obtain a medical release for fitness to return to duty." (Compl. ¶¶ 14(a), 17; Trussell Dep. 99-100.)

On Saturday, May 16, 2009, after he saw that he had missed a call from Capt. Bohanan, he returned Bohanan's call and let him know that hat he had been unable to get an appointment and thus did not yet have a release. (Compl. ¶ 17(a); Trussell Dep. 70.) He said that he was going to call Defendant Perry on Sunday, but, he alleges that Capt. Bohanan said "I'll take care of it." (Trussell Dep. 70.) On Monday, May 18, he had a

-4-

doctor's appointment at around 2:00 p.m., got x-rays and a splint, and a note from the doctor saying "George Trussell needs to be off work for five to six weeks," which would put his return date at either June 22 or June 29. (Trussell Dep. 72-73, 76.)[1]

The next day, Tuesday, May 19, Plaintiff went to the fire hall at around 8:00 or 8:30 a.m. to give Defendant Perry his doctor's note and to "talk to the chief because [he] had done got in trouble for not talking to him personally." (Trussell Dep. 76-77.) After Defendant Perry told Plaintiff he needed to see him, Perry, Bohanan, and Plaintiff went into the living quarters to have a meeting, which culminated in Defendant Perry's suspending Plaintiff for three days without pay for failure to notify him (Perry) of the injury and his inability to return to work. (Compl. ¶ 18; Trussell Dep. 77.) When Plaintiff said he did not think the suspension was right, Defendant Perry said "[i]f I let you by with it, I won't have control over nobody." (Trussell Dep. 101.) Plaintiff asked for and received a copy of the standard operating procedures, which he said he had never seen before but knew there was one. (Trussell Dep. 67.)

The Employee Disciplinary Action Form (Doc. 23-2, Ex. 1GT to Trussell Dep.), dated May 18, 2009, specifies as the type of violation "Other,"[2] and describes it as "DID NOT CALL ME OVER Weekend he is STILL OFF 5-18-09 - 5-19-09." In the box for the employer's statement, Perry wrote that: "George broke his finger on 5-13-09 did not know until the next day he call eric on wed. night and did not work Thurs or Friday. I told him

---

[1] Bohanan's version of the events, laid out in his June 24, 2009 post-termination letter to Plaintiff's personnel file, differed significantly from Plaintiff's account insofar as, he says, Plaintiff called on Thursday evening, rather than stopping by in person and he said he told Plaintiff to call Perry, which Plaintiff never did. (Doc. 23-5, Ex. 5GT to Trussell Dep., June 24, 2009 letter from Eric Bohanan to Plaintiff's personnel file.)

[2] The other types of violation available but not selected included: attendance, carelessness, disobedience, safety, tardiness, and work quality.

when he came to fire hall on 5-14-09 he needed a doctor release before he came back to work the [illegible] He did not call me or anyone to let them know he was takeing off on the 18th and 19th had to get someone to work the day before his shift." In the box for the employee statement – still in Perry's handwriting – it says "Talk to Eric. Eric said George was going to call me." In contrast (or in addition) to Plaintiff's testimony, the Employee Disciplinary Action Form actually specifies not only "3 days off without pay" but also "possible replace him with another worker" in the "warning decision" box.

Plaintiff refused to sign the Employee Disciplinary Action Form and said he wanted a hearing before the City's Board of Aldermen. (Compl. ¶ 19; Trussell Dep. 83-84.) He alleges that Defendant Perry told him to "call them up here," but that when he started to walk toward the phone to call Defendant Etheridge – the acting Fire Department liaison for the City – Defendant Perry said "I'm telling you now, if you go over my head, I'm firing you." ( Trussell Dep. 86.) Despite this warning, Plaintiff called Etheridge and, when he arrived in Perry's office, each side filled Etheridge in on "the situation," *i.e.* "[Plaintiff's] finger, the three-day suspension and all that." (Compl. ¶ 21; Trussell Dep. 87-88.) Etheridge said "I'm not going to go against that, but you have a right to . . . [f]ile a grievance," although he "could not tell [Plaintiff] who the grievance board was." (Trussell Dep. 88, 90.) Defendant Perry responded that, while the City had policies, "'they' did not go by them." (Compl. ¶¶ 23-24; Answer ¶.) Because Etheridge said he was not going to go against Perry's decision, Plaintiff alleges that this "render[ed] the grievance process moot." (Compl. ¶¶ 21-22; Answer ¶ 22.)

A week later, he met again with Defendant Perry, saying that his suspension was not fair. Perry said the suspension did not have anything to do with the cursing, but was

-6-

because Plaintiff "went over his head by calling [ ] Etheridge," which Perry believed was "disrespectful." (Trussell Dep. 101-02.) Perry also told Plaintiff that "[u]nless I change my mind, you're not coming back." (Trussell Dep. 104.) He also said he had talked to three aldermen about the situation and that "they told him to do what he felt necessary and they'd back him." (Trussell Dep. 106.)

On Tuesday, June 2, 2009, Plaintiff got a medical release to return to full duty – less than three weeks after his injury and three to four weeks sooner than anticipated – and attempted to return to work, but Defendant Perry said he had decided not to let Plaintiff come back to work and that he was fired for going over his head. (Compl. ¶¶ 25-26; Trussell Dep. 107-08.) In his June 24, 2009 letter to Plaintiff's personnel file, Perry explains the circumstances leading up to Plaintiff's termination as follows:

> George Trussell has had several verbal warnings in the past year regarding his attitude toward authority and being a team player. When he broke his finger and was told by the Captain on duty to contact the Fire Chief and he refused to do so, I finally decided that I would write him up. After giving him written notice he went over my head and went to one of the city aldermen. At this time the decision was made to terminate him.

(Doc. 23-6, Ex. 6GT to Trussell Dep., June 24, 2009 letter from Def. Perry to Plaintiff's personnel file.)

Defendant Perry told him that the City would fire him at the Board of Aldermen meeting on Monday, June 8, 2009, the published agenda for which included "Dismiss Firefighter George Trussell." (Compl. ¶¶ 27-28; Trussell Dep. 108; Doc. 23-7, Ex. 6GT to Trussell Dep., Proposed Agenda Decherd Board of Mayor and Aldermen, June 8, 2009.) He did not give Plaintiff anything in writing at that point and said that Plaintiff "could not come back to work until they decided what they were going to do on June 8th," and that

he did not have to bring his equipment back because it "wasn't a done deal." (Trussell Dep. 109, 110.) Plaintiff decided to draw up a grievance letter (Doc. 23-3, Ex. 2GT to Trussell Dep.), which he took to Captain Martin Tyler on June 6, 2009, as Tyler would be on duty and see Perry the morning of June 8. He had Captain Tyler sign and date the grievance letter, before copying it and giving Tyler a copy to give to Perry. (Trussell Dep. 111, 113.)

At the Board of Alderman meeting on June 8th, when it came time to discuss Plaintiff, first Perry stood and "said what he wanted to say about what happened," then Trussell said that he thought he was being dismissed unfairly and spoke about that. (Trussell Dep. 145.) Etheridge asked to see his grievance letter and read it aloud, adding that it was correct insofar as he had said that he would not go against Perry's decision. (Trussell Dep. 145-47.) Vice-Mayor Stratton told Plaintiff "that [he] was a grown man and it was [his] responsibility to notify somebody when [he] wasn't going to be able to cover a shift," but when Stratton said he was going to move to dismiss Plaintiff because he didn't call in, Perry said he wanted Plaintiff dismissed "for going over [his] head." (Trussell Dep. 146, 148.) Johnny Trussell then addressed the Board, saying that allowing Plaintiff's termination "approved Mr. Perry to rule his department out of intimidation." (Trussell Dep. 147-48.) Plaintiff said that the Board said that "they was backing Mr. Perry's decision," and so he assumed that they were "dismiss[ing him] on [Perry's] decision." (Trussell Dep. 148.) The separation notice the City gave to Plaintiff (Doc. 23-4, Ex. 4GT to Trussell Dep.) stated that he "was terminated by Board for breaking chain of command and going over a supervisor's head ~~with~~ relating to an improper notification of being unable to work"; it was signed by Mayor Betty Don Henshaw, who also told Plaintiff that he had broken the chain of command by contacting Defendant Etheridge. (Compl. ¶¶ 30-32.) Plaintiff then left the

-8-

meeting and returned his equipment the next day. (Trussell Dep. 150.)

## B. Plaintiff's Religion and His Objections to Coworkers' Behavior

Plaintiff alleges that he complained to Defendant Perry about the foul language used by other firefighters, but that Defendant Perry refused to address his concerns and instead "offered plaintiff to 'step outside' to 'fight.'" (Compl. ¶¶ 33(b)-(d).) Plaintiff describes himself as "a devout Christian" and says that his religious beliefs "included a prohibition on the use of foul language." (Compl. ¶¶ 33(a), 51.) If someone was cursing around Plaintiff, he believed that the Bible tells him "not to be around it." (Trussell Dep. 35.) The behavior Plaintiff found objectionable – the "cursing and stuff" – appears to include not only cursing, which the other firefighters "knew [he] didn't like . . . even when [he] was a volunteer," but "[a]nything that offended anybody," like "dirty pictures." (Trussell Dep. 44, 50.)

It is clear that this behavior was already occurring when he was originally brought on as a volunteer and continued throughout his employment, but it is not clear when he first complained of the issue to Defendant Perry. (Trussell Dep. 36-37, 48, 50.) In some places, he says he complained to Chief Perry "during when [he] was full time," and in others, he says that he complained to Chief Perry after he had been "[t]here for a couple of weeks . . . [m]aybe even a couple of months," at which time "it was cussing all the time, showing nasty pictures on the phones." (Trussell Dep. 48.) Regardless, while Plaintiff did have some problems while he was a volunteer, he said that during that time, he did not "have any problems with people infringing on [his] freedom of religion," in part because he could get away from it, and that "[i]t pretty much all started after I went full time." (Trussell Dep. 36-37, 44-45.)

During the relevant time period, Plaintiff went to the Living Water(s) Independent Church. (Trussell Dep. 18-19, 31:9-14.) Plaintiff's cousin Jimmy Trussell was also a firefighter with the Decherd Fire Department and also attended Plaintiff's church. (Trussell Dep. 31:24-32:8.) Jimmy Trussell resigned the same evening Plaintiff was fired at the same June 8, 2009 Board of Aldermen meeting, but his resignation was unrelated to Plaintiff's firing or his religion, and Plaintiff believes it was due to his engaging in an extramarital affair with the wife of another fireman. (Trussell Dep. 32-33.) Plaintiff says that Jimmy had the same complaints "about the cursing and things that went on," (Trussell Dep. 34.) Other fire department employees went to other churches, but they "never talked much about [different beliefs or tenets or churches] much." (Trussell Dep. 43.) Plaintiff says that Defendant Perry told him "several times he thought [Plaintiff] took [church] too serious." (Trussell Dep. 44.) While Defendant Perry went to another church in Winchester, he also went to Plaintiff's church once, as did Capt. Bohanan. (Trussell Dep. 59.)

Plaintiff said that, at some point between October 2007 and June 2009, when he was employed there full-time, there was a sexual harassment class that he said addressed "[a]nything that offended anybody." (Trussell Dep. 50.) Because, he believed, that class taught the firefighters that where any of those things that offended anybody, including cursing, "you weren't supposed to do it," he approached Perry and suggested he should "[a]sk [the other firefighters] not to curse around me and see how we get along." (Trussell Dep. 51-52.) He said that Defendant Perry refused to do anything about it, saying that he "was not going to stop 18 people from doing something stress-relief to satisfy George Trussell." (Trussell Dep. 51.) When Defendants' counsel pointedly asked about a series of meetings Defendant held to address Plaintiff's concerns – which meetings Plaintiff

-10-

confirmed – Plaintiff clarified his earlier statement

Because Plaintiff next said that Defendant Perry called "a couple of meetings" to address his concerns, he clarified his earlier statement and said that by "refused to do anything about it" he meant "not going to make [the other firefighters] stop." (Trussell Dep. 52-53.)

Plaintiff says that Etheridge told him that Perry had told him [Etheridge] that "if [Plaintiff] would have still had a job if [he] had not called Johnnie Etheridge over [Perry's] head." (Trussell Dep. 127.) Further, Plaintiff himself even said that Perry did not "ever take any adverse employment action towards [him] as a result of these discussions or [his] complaining about cursing." (Trussell Dep. 54.) Despite Perry's statement that his termination was due to contacting Etheridge, despite the fact that Perry never said that the termination was related to his complaints, and despite Plaintiff's statement that Perry never took any adverse employment action against him based on his complaints, Plaintiff still says (at one point) that he believes that his complaints led up to his termination, although not his suspension. (Trussell Dep. 128.)

Plaintiff says he believes it is all related because Defendant Perry "told [him] several times in some of the [post-injury meetings] that it would be best for [Plaintiff] to look for another job," and because Defendant Perry told him that "[Plaintiff] wasn't one of them, ain't never going to be one of them." (Trussell Dep. 128-30.) When asked what Defendant Perry meant by such statements – or similar statements like that Plaintiff "didn't fit in, [ ] was never one of them, wasn't one of them now, and never would be one of them" – he said it was "because [Plaintiff] was different." (Trussell Dep. 52.) The other firefighters appear to have "complained that [Plaintiff] didn't want to be around them," because Plaintiff would leave "when they started cursing," but neither Plaintiff nor the other firefighters was

-11-

"going to budge." (Trussell Dep. 53.) Plaintiff's complaints were not limited to his religiously-based objections to others' language; Plaintiff also complained about other firefighters' smoking in the fire hall in contravention of a City referendum or memorandum and that the other firefighters "complained about me because that was one of my complaints." (Trussell Dep. 131-32.) As with the cursing, Defendant Perry refused to make the others stop smoking inside, saying "I'm not going to make them go outside to smoke." (Trussell Dep. 139.) At the May 19, 2009 meeting where Plaintiff was suspended, Capt. Bohanan and Plaintiff argued whether Bohanan told Plaintiff to call Perry, but at no time did anyone say anything about Plaintiff's complaints about smoking or cursing, although Plaintiff said that they did discuss them in subsequent meetings. (Trussell Dep. 131, 134-37.)

Regardless, when defense counsel asked Plaintiff if he "took [the comment that "you ain't one of them and won't be one of them"] to mean that [he was] being fired because of [his] religion and because [he] wouldn't let them smoke in the fire hall," Plaintiff again denied that they were related to his termination, saying "[n]o, no. This was just a reason to get me out." (Trussell Dep. 140.)

C.     **Procedural History of this Action**

On December 22, 2009, Plaintiff filed his Complaint (Doc. 1) in this action, alleging several different causes of action against Defendants the City of Decherd and Harold Perry and Johnnie Etheridge, individually and in their official capacities, including state law causes of action and claims for deprivation of his federal statutory and constitutional rights – including procedural due process, equal protection, and First Amendment rights – pursuant to 42 U.S.C. § 1983. Defendants filed their answer (Doc. 2) on January 11, 2010. Then, on February 15, 2011, they filed their Motion for Summary Judgment (Doc. 16)

-12-

("MSJ") together with a Memorandum in Support (Doc. 17) ("MSJ Mem."), a Statement of Material Facts (Doc. 18), and excerpts from Plaintiff's July 14, 2010 deposition (Doc. 19).

On March 18, 2011, Plaintiff filed his Response to Defendants' Motion for Summary Judgment (Doc. 23) ("Respon."), together with twenty-four exhibits in support, including the complete transcripts of the depositions of Plaintiff (Doc. 23-1) ("Trussell Dep."), Defendant Perry (Doc. 23-9) ("Perry Dep."), and Defendant Etheridge (Doc. 23-22) ("Etheridge Dep.") and the exhibits attached thereto.

On March 25, 2011, Defendants filed their Reply Brief (Doc. 24) ("Reply") together with the Affidavit of Mayor Betty Don Henshaw (Doc. 24-1 at 1-2) ("Henshaw Aff."), itself attaching a true and correct copy of the Employee Handbook for all City of Decherd employees in effect at the time in question (Doc. 24-1 at 3-22) ("Personnel Manual"). This matter is now ripe for review.

## III. ANALYSIS

Plaintiff's description and discussion of the rights he claims Defendants – both the City of Decherd and Harold Perry and Johnnie Etheridge, both individually and in their official capacities – violated ranges from merely confusing to almost unintelligible, but in the Complaint he appears to allege the following causes of action:

(1)     for deprivation of his rights[3], pursuant to 42 U.S.C. § 1983, including:

(a)     procedural due process, as secured by the Fourteenth Amendment

---

[3] Plaintiff asserts that Defendants "deprived the plaintiff his rights secured to him under the United States and Tennessee Constitutions" (Compl. ¶ 42), but 42 U.S.C. 1983 "is [ ] limited to deprivations of federal statutory and constitutional rights," and "does not cover official conduct that allegedly violates state law." *Michael v. Ghee*, 498 F.3d 372, 375 (6th Cir. 2007) (internal citations and quotation marks omitted). As this cursory reference is one of only two mentions of the Tennessee Constitution (Compl. ¶¶ 8, 42), and as he cites no other authority for the recovery for Defendants' alleged violations of the Tennessee Constitution, the Court will consider the Complaint to allege violations of his rights arising from the U.S. Constitution alone.

-13-

to the United States Constitution, by "depriv[ing] plaintiff of his rights to Procedural Due Process . . . in plaintiff's complaints about the foul language used in plaintiff's presence," (Compl. ¶¶ 3, 39);

(b)     equal protection of the laws, also secured by the Fourteenth Amendment, by "depriv[ing] plaintiff of his rights to . . . Equal Protection of law in plaintiff's complaints about the foul language used in plaintiff's presence," and "Equal Protection of law in plaintiff's ability to obtain a hearing on the discipline" (Compl. ¶¶ 3, 7, 39);

(c)     freedom of religion (Compl. ¶¶ 39, 42); and

(d)     freedom of speech, also secured by the First Amendment, by "den[ying] plaintiff the opportunity to address his grievances to the City" (Compl. ¶¶ 42(c), 48(c));

(2)     for "a conspiracy violation of this law [42 U.S.C. § 1983] and were done to deprive the Plaintiff of [his due process, equal protection, and freedom of speech] rights" (Compl. ¶ 48);

(3)     for punitive and actual damages and attorney fees pursuant to 42 U.S.C. § 1988 (Compl. ¶ 49);

(4)     for intentional infliction of emotional distress, under Tennessee state law (Compl. ¶¶ 50, 53);

(5)     for a violation of Tenn. Code Ann. § 4-21-701, the provision of the Tennessee Human Rights Act ("THRA") creating a civil cause of action for malicious harassment, "in that the defendants engaged in harassment of plaintiff for plaintiff's religious beliefs that included prohibition on the use of foul language" (Compl. ¶ 51);

(6)     for the "tort of outrage," under Tennessee state law (Compl. ¶ 53);

(7)     for "civil conspiracy," under Tennessee state law (Compl. ¶ 53); and

(8)     against Perry alone, for assault under Tennessee state law (Compl. ¶ 53)

Because Defendants argue that the Court should refrain from ruling on the state law claims – claims #4-#8 above – and decline to exercise supplemental jurisdiction over them pursuant to 28 U.S.C. § 1367, the Court will first address Plaintiff's federal claims brought pursuant to Section 1983 and then address Plaintiff's state law claims.

-14-

Section 1983 provides that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." A plaintiff bringing a claim pursuant to Section 1983 must show both "the violation of a federally protected right" and that "the deprivation [was] committed by a person acting under color of law." *Grinter v. Knight*, 532 F.3d 567, 572 (6th Cir. 2008) (internal quotation marks and citations omitted).

### A.    Procedural Due Process Claim

Plaintiff fails entirely to address Defendants' argument that because he was an at-will employee, he did not have a property interest in his continued employment and thus failed to establish that he was deprived of a property right. While the Due Process Clause does "prohibit[ ] the state from depriving any person of life, liberty, or property without due process of law," those property rights "are not created by the Constitution," but rather "are defined by existing rules or understandings that stem from an independent source such as state law." *Kizer v. Shelby Cnty. Govt.*, 649 F.3d 462, 466 (6th Cir. 2011) (internal citations and quotation marks omitted). Therefore, "in order to determine whether there was a due process violation, it is first necessary to ask whether the former employees have demonstrated that they were deprived of a property right." *Id.*

While Plaintiff spends a great deal of his responsive brief either citing and excerpting at length from decades-old case law addressing generally procedural due process claims or discussing the alleged inadequacy of the process in this case in

particular, he only spends fifty-five words addressing the specific property rights allegedly implicated in this case:

> In the instant matter, the City has admitted it is a governmental entity. Plaintiff was undoubtedly a City employee. The City had policies and a SOP to guide the City and its employees' right to grievances of adverse employment actions. These three factors firmly established plaintiff's property interest in his continued employment with the City.

(Respon. 15) (citations omitted).

Plaintiff seems to believe that the City – by virtue of being a governmental entity and choosing to adopt policies for addressing grievances – has automatically created a property interest in continued employment, but he cites no authority for such a principle; indeed, much of the case law and evidence seems to indicate the opposite.[4]

In *Kizer*, for instance, the United States Court of Appeals for the Sixth Circuit discussed the Tennessee Civil Service Merit System for employees of Shelby County, Tennessee, established by Chapter 110 of the Tennessee Private Acts (the "Act") passed by the Tennessee General Assembly in 1971. *Kizer*, 649 F.3d at 463. Pursuant to the terms of that Act, if a position is "classified," civil service protections apply to that position, and those employees are not terminable at will. *Id.* Those public employees categorized as classified – "that is, not subject to removal at will" – "have a state-law-created, constitutionally protectable property interest in maintaining their current employment"; "[c]onversely, unclassified employees have no property right in maintaining their jobs" and

---

[4]  Defendants attach to their Reply the affidavit of Mayor Henshaw, who states that she "signed Resolution 8-99" which "creates a personnel policy for all employees of the City of Decherd," and which specifies that "[a]ll employees of the City of Decherd covered by the Resolution are at-will employee," (Doc. 24-1, Henshaw Aff. ¶¶ 3, 6.) Those not covered by the Resolution include "elected officials, independent contractors, and legal advisors." (Henshaw Aff. ¶ 3.) A true and correct copy of Resolution 8-99 is attached to her affidavit; it was adopted on November 8, 1999, well before Plaintiff began his employment with the City.

may be terminated "summarily." *Id.* at 466 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-40 (1985)).

Likewise, in *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752 (6th Cir. 2010), the Sixth Circuit said that while "[g]overnmental employees ***may*** have a property interest in continued employment, ***in which case*** they must be afforded due process before being discharged," "[t]hese property interests are created by a source independent of federal law, such as state law" and so it had to "look to Michigan state law to determine whether Pucci had a property interest." *Pucci*, 628 F.3d at 765-66 (emphasis added). The applicable state (Michigan) law in *Pucci* "generally presumes that employment relationships are 'at-will' arrangements" and that "at-will employees . . . have no property interest in their continued employment," but the Sixth Circuit did outline the ways in which parties could overcome that presumption, eventually finding that the plaintiff had offered evidence that, taken in the light most favorable to her, rebutted that presumption. *Id.* at 766.

Like the Michigan law cited in *Pucci*, there is a general presumption in Tennessee that, in the absence of an employment contract, "an employee is an employee at will." *Crews v. Buckman Labs. Intern., Inc.*, 78 S.W.3d 852, 864 (Tenn. 2002) (quoting *Rose v. Tipton Cnty. Pub. Works Dep't*, 953 S.W.2d 690, 691 (Tenn. Ct. App. 1997)). *See also*, *Cummings Inc. v. Dorgan*, 320 S.W.3d 316, 332 (Tenn. Ct. App. 2009) ("In Tennessee, employees are presumed to be employed at will in the absence of an agreement for employment for a term certain."). Plaintiff has not alleged, let alone shown, the existence of either an applicable statute establishing civil service protections or an employment contract. Further, while Tennessee has "recognized . . . restrictions . . . [on] the right of an

-17-

employer to terminate an employee when the employee is discharged in contravention of well-defined and established public policy," Plaintiff also has not specifically alleged, let alone offered any evidence of, the applicability of any of these recognized restrictions. *See Guy v. Mutual of Omaha Ins. Co.*, 79 S.W.3d 528, 534-35 (Tenn. 2002). Finally, Plaintiff, unlike the plaintiffs in *Kizer*, has not alleged, let alone offered any evidence on, the applicability of any civil service protections or categorizations that would remove him from employment at will.

Accordingly, because Plaintiff has not rebutted the presumption that he was an employee at-will, he has not shown that he has a "constitutionally protectable property interest in maintaining [his] employment," and thus "the Due Process Clause offers no procedural protections" to him. *Kizer*, 649 F.3d at 468. Therefore, Defendants' Motion for Summary Judgment (Doc. 16) will be **GRANTED** as to Plaintiff's procedural due process claims, and those claims will be **DISMISSED WITH PREJUDICE**.

## B.    Equal Protection Claim

### 1.    The nature and scope of his claim

Because the nature and scope of Plaintiff's equal protection claim is unclear from the Complaint,[5] the Court looks to Plaintiff's Response (Doc. 23) in determining the nature

---

[5]    In one paragraph, Plaintiff alleges that "[t]he entirety of the agents named in this law suit conspired to violate the plaintiff's civil rights in that they deprived plaintiff of his rights to . . . Equal Protection of law in plaintiff's complaints about the foul language used in plaintiff's presence [and] Equal Protection of law in plaintiff's ability to obtain a hearing on the discipline imposed by Perry and ratified by Etheridge, the mayor, and the City . . . ." (Compl. ¶ 39.)

These "equal protection" rights are repeatedly listed separately from his speech and religious rights. *See* (Compl. ¶ 39) (alleging that defendants "impeded plaintiff's rights to Freedom of Religion" separately from the above-excerpted language); (Compl. ¶ 42) (alleging that "[t]he agents acted under color of law, and at the time of such occurrence, acting by virtue of or under color of the office, and their negligence and intentional acts deprived the plaintiff his rights secured to him under the United States and Tennessee Constitutions as follows: a. Procedural Due Process; b. Equal Protection of law; c. Freedom of Speech and Religion.").

and scope of those claims. The entirety of his Response as to his equal protection claims

is as follows:

> "[A]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 730 (2007) (alteration in original). *See also Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 292 (1998) (Stevens, J. concurring in part, dissenting in part) (obsefving [*sic*] a governor could not ignore the commands of the Equal Protection Clause and use race, religion, or political affiliation as a standard for granting or denying clemency).
>
> In the instant case, the evidence shows Perry berated plaintiff for his deeply held religious beliefs. This grew to the inane and unreasonable suspension, the closed-door meeting between Perry and the three aldermen, Perry's threats against plaintiff in response to plaintiff's request to seek redress of the suspension, and the pre-ordained termination at what should have been plaintiff's "hearing" on the suspension.

(Respon. 19.) Plaintiff, therefore, appears to be arguing that he was "berated," suspended,

threatened, and then ultimately terminated because of his religious beliefs and thus was

denied equal protection of the laws based upon his religion.

### 2.    The requirements of Plaintiff's religion and its effect on his work

As an initial matter, it is not clear what Plaintiff's religion required – of him, those

around him, or his surroundings – or what effect it actually had on Plaintiff's working

experience. As to his religion's requirements, Plaintiff seems to argue that all cursing is

against his religion, but then goes on to say he could "kind of handle small words . . . [b]ut

[that] when it gets into what I would say big words," that was a problem for him. (Trussell

Dep. 49.) Further, at least one other firefighter – his cousin Jimmy Trussell – was a

-19-

member of his church, espoused the same principles, and (allegedly) had the same objections, and yet he does not appear to have had suffered any of the negative effects on his working environment that Plaintiff did. The two individuals most closely linked to his termination – Capt. Bohanan and Defendant Perry – actually visited his church with him outside of working hours. (Trussell Dep. 59.)

Likewise, it is not clear when, if ever, Plaintiff was actually required to be around the language he found offensive. Early in his deposition, he distinguished between his time as a volunteer – when he said his religion was not infringed because he "didn't have to listen to it [and] could leave if [he] wanted to" – and after he became a full-time employee, when he "had to endure it." (Trussell Dep. 45.) Shortly thereafter, though, he says that when the other firefighters "got to cursing," he would "just walk off" or "go somewhere else," and that the other firefighters "didn't want to be around [him] because of the way . . . the standards [he] took on not cursing and stuff," so it does not seem as though he was required to be around cursing in contravention of his religious principles. (Trussell Dep. 46, 53.)

In addition, it is not clear how many employees engaged in this objectionable behavior or, of those who did, how many stopped upon his request. While it is certainly clear that both Plaintiff and certain other employees – like Michael Williams, who said "I'm not watching my mouth for nobody" – "weren't going to budge" on the language issue, when Plaintiff complained about other firefighters showing him "nasty pictures," he "got them to stop," and several other firefighters – Sam Pierce, Jimmy Trussell, Johnny Trussell, Martin Tyler – either did not curse or did not curse around him (Trussell Dep. 48, 53-54.)

Finally, Plaintiff has not put forth sufficient evidence to show that there is a link

between his religion and any adverse employment actions. First, and perhaps most importantly, whenever the question of an explicit connection is raised, Plaintiff himself repeatedly disclaims any connection.[6] In addition, Plaintiff alleges that Defendant Perry repeatedly told him (and others) that his termination was due to going outside the chain of command and that he told Defendant Etheridge (allegedly) that "[Plaintiff] would have still had a job if [he] had not called Johnnie Etheridge over [Perry's] head." (Trussell Dep. 127.) Further, while counsel spend the most time discussing his objections to cursing, it is clear

---

[6] Three separate instances from his deposition include:

Q. Did Chief Perry ever take any adverse employment action towards you as a result of these discussions and you complaining about cursing? In other words, did he suspend you or did he change your shift or did he do anything bad to you?
A. No, sir.
. . .
Q. And it was your understanding that this was over the fact that you had not called him directly or that was the allegation?
A. Yes, sir.
Q. And neither chief Perry or even Eric ever said anything about this had anything to do with the cussing or any of that; right?
A. No, sir.
Q. That's correct?
A. Correct.
Q. What I just said is correct?
A. Yes, yes. This didn't have nothing to do with that.
. . .
Q. Why were you bringing this [smoking] up at that point?
A. Because I think all this stemmed from it. I think it played a part in it.
Q. Your disciplinary action?
A. I think it played a part in it, yes, sir.
Q. And your termination?
A. In my opinion, yes, sir.
Q. But no one ever told you that?
A. Not straight out.
Q. Did anyone insinuate that?
A. Not at that time.
Q. When?
A. Well, you know, when somebody tells you that you ain't one of them and won't never be one of them . . .
Q. So you took that to mean that you were being fired because of your religion and because you wouldn't let them smoke in the fire hall?
A. No, no. This was just a reason to get me out.

(Trussell Dep. 54, 101, 139-40.)

that was only one of a few issues Plaintiff had with Defendant Perry and his fellow firefighters and about which he complained, with smoking being the most obvious other one. (Trussell Dep. 131-32, 139.)

Finally, this "objectionable" environment – of the other firefighters' cursing – had existed since before Plaintiff was hired, and yet during the years he was with the fire department, he was promoted from volunteer to full-time. Further, even though Plaintiff argues that the religious issue became more of a problem after he was hired, he had still been employed for twenty months under those circumstances before he was terminated.

### 3. The applicable case law and analysis

The Equal Protection Clause of the United States Constitution prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. For Plaintiff's equal protection claim to survive, he must show that "the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 299 (6th Cir. 2006)). Disparate treatment is "the threshold element of an equal protection claim," and if it is shown, then "the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Id.* (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006)) (internal quotation marks omitted).

First, as in *Center for Bio-Ethical Reform, Inc.*, Plaintiff "fails to make a plausible

allegation that similarly situated organizations and individuals, of a different [religious] viewpoint, have not been subject to the same alleged treatment by Defendants." 648 F.3d at 379. Because there is no "plausible allegation of disparate treatment," he fails to state an equal protection claim, let alone adduce sufficient evidence to survive summary judgment. Even if this Court were to attempt to read such an allegation from his recitation of the facts and bare pleadings, Plaintiff still fails.

He does not even allege that he was a member of a suspect or quasi-suspect class – that is, one defined by race, alienage, or national origin or defined by gender or illegitimacy, respectively – let alone show that he was targeted as a result of such membership. *See, e.g.*, *Equality Found. of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F.3d 289, 293, n.3 (6th Cir. 1997) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) in defining "suspect class" and "quasi-suspect class").

Likewise, while religious freedom is a "fundamental right," he does not allege that the government action infringed on a *class* of people's fundamental rights, just his own fundamental rights. While some equal protection claims can be premised upon a "class of one" – that is, where a plaintiff "must allege that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment," *see*, *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 549 (6th Cir. 2007) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)) – the Sixth Circuit has clearly "decline[d] to extend the fundamental rights analysis to classes of one [because to] so extend the fundamental rights analysis would allow the Equal Protection Clause to render other constitutional provisions superfluous." *Scarbrough*,

-23-

470 F.3d at 261 (citing *Olech*, 528 U.S. at 564).

Therefore, this Court only considers whether a government action is considered irrational only if it is "unrelated to the achievement of any combination of the legitimate purposes." The exact government action at issue is unclear, whether it is Defendant Perry's failure to make other firefighters stop using language Plaintiff found objectionable or Plaintiff's suspension or termination. But, as noted above, Plaintiff himself would not state that they were tied to his religion, exclusive of any rational basis, and on their faces, all such actions are supported by legitimate purposes – stress relief, maintaining unit cohesion, maintaining the chain of command, etc.

Because Plaintiff neither states nor adduces evidence in support of a "plausible allegation of disparate treatment," he fails to state an equal protection claim. Therefore, Defendants' Motion for Summary Judgment (Doc. 16) will be **GRANTED** as to Plaintiff's equal protection claims, and those claims will s be **DISMISSED WITH PREJUDICE**.

### C.     Freedom of Religion Claim

As with all his other claims, the nature and scope of Plaintiff's "freedom of religion" claim is unclear from the Complaint, except that this claim is even less clearly pled.[7] Normally the Court would look to Plaintiff's Response (Doc. 23) to determine the nature and scope of these, but Plaintiff did not address the Freedom of Religion claim (outside the Equal Protection claim) ***at all*** in his Response. Accordingly, this Court cannot find that he

---

[7] Plaintiff only mentions "freedom of religion" twice in his Complaint: (1) "[t]he entirety of the agents named in this law suit conspired to violate the plaintiff's civil rights in that they . . . impeded plaintiff's rights to Freedom of Religion," and (2) [t]he agents acted under color of law, and at the time of such occurrence, acting by virtue of or under color of the office, and their negligence and intentional acts deprived the plaintiff his rights secured to him under the United States and Tennessee [including] Freedom of Speech and Religion." (Compl. ¶¶ 39, 42.)

-24-

has stated a claim upon which relief can be granted, let alone adduced sufficient evidence to survive summary judgment.

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded; at a minimum, the court is required to examine the motion to ensure that the movant has met his initial burden. *Stough v. Mayville Cmty. Sch.*, 138 F.3d 612, 614 (6th Cir. 1998). But, in the absence of a response, the court will not "*sua sponte* comb the record from the partisan perspective of an advocate for the non-moving party." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 410 (6th Cir. 1992). "Rather, in the reasoned exercise of its judgment the court may rely on the moving party's unrebutted recitation of the evidence, or pertinent portions thereof, in reaching a conclusion that certain evidence and inferences from evidence demonstrate facts which are 'uncontroverted.'" *Id.* If such evidence supports a conclusion that there is no genuine issue of material fact, the court will determine that the moving party has carried its burden, and "judgment shall be rendered forthwith." *Id.* (alteration omitted).

The Court has carefully reviewed the entire record, including those "particular parts of materials in the record" to which Defendants cite in their Motion and accompanying brief, and finds that it supports their recitation of the material facts, which the Court will therefore rely on as uncontroverted. *See* Fed. R. Civ. P. 56(c)(1)(A); *Guarino*, 980 F.2d at 407. Even

-25-

if this Court were to "*sua sponte* comb the record from the partisan perspective of an advocate for the non-moving party," though, Plaintiff's claim would still fail.

As outlined in significantly more depth *supra*, in the Court's analysis of Plaintiff's equal protection claim, Plaintiff has not shown that there was any infringement on his free exercise of his religion. Although he did not establish the precise scope of the requirements of his religious belief, it is nonetheless clear that the objectionable behavior predated his presence at the fire hall, and he worked there as a volunteer for several years while managing these allegedly conflicting issues. Further, even as a paid employee, and despite some conclusory statements to the contrary, his own testimony and the balance of other evidence shows that Plaintiff walked away when he found something offensive. Further, in response to his complaints, his supervisor held repeated meetings to discuss his desire for less cursing, resulting in several firefighters who did not curse around him. Defendant Perry did find some value in allowing a relaxed standard as to language, and Plaintiff did not identify any case law or provision requiring his religious beliefs to trump the work behavior of the many other employees. Therefore, as it relates to his treatment at work, he has not shown his free exercise of his religion was impaired.

In addition, Plaintiff has not shown that any adverse employment actions were related to his free exercise. For instance, and despite some conclusory statements to the contrary, Plaintiff's own testimony reveals that his behavior in complaining about and censuring his supervisor, Chief Perry, and his coworkers, was related not just to the foul language, but to other behavior – such as smoking indoors – he deemed inappropriate, but not for religiously-based reasons. In addition, another firefighter who practiced the same religious beliefs did not suffer any ill treatment as a result of those beliefs. The adverse

-26-

employment action was repeatedly confirmed to be based upon Plaintiff's issues with the chain of command and not his religious beliefs. Finally, and most importantly, Plaintiff himself repeatedly stated that he did not believe that the suspension and dismissal were related to his religious beliefs.

Plaintiff has not only failed entirely to state a "freedom of religion" claim that is plausible on its face, he has also failed to respond at all to Defendants' Motion for Summary Judgment as to his "freedom of religion" claim. Accordingly, Defendants' Motion for Summary Judgment (Doc. 16) will be **GRANTED** as to Plaintiff's Section 1983 "Freedom of Religion" claims, and those claims will be **DISMISSED WITH PREJUDICE**.

### D. Freedom of Speech Claim

Plaintiff's pleading as to his "freedom of speech" claim is once again unclear and bare, alleging solely that "[t]he agents acted under color of law, and at the time of such occurrence, acting by virtue of or under color of the office, and their negligence and intentional acts deprived the plaintiff his rights secured to him under the United States and Tennessee [including] Freedom of Speech and Religion" and that he was deprived of his right to "Freedom of Speech in that the City denied plaintiff the opportunity to address his grievances to the City, for they decided to terminate plaintiff beforehand." (Compl. ¶¶ 42(c); 48(c).)

As with the previous three claims, this Freedom of Speech/Petition claim is essentially unopposed. There is a very limited response which the Court looks to for some assistance in clarifying the matter, which is, in its entirety, as follows:

> All citizens have a right to petition the government to seek redress. *See* U.S. Const. amend. 1. In the instant matter,

> plaintiff petitioned the City government to aggrieve Perry's suspension. Instead of addressing his petition, the City merely ignored it, and fired plaintiff in retaliation for bucking the City's system.

(Respon. 19.) This "response" actually helps clarify the Complaint in one aspect: although the relevant claim is referred to in both the Complaint and the Summary Judgment Response as a "free speech" claim, both the Complaint and the Response speak of his being denied the opportunity to petition the government for redress of his grievances. (Compl. ¶ 48(c); Respon. 19.) While this claim appears to be a roundabout attempt to assert a procedural due process *Loudermill* claim in a different guise, to the extent he is attempting to state a separate cause of action, he appears to be bringing not a freedom of speech claim, but rather a claim made pursuant to the Petition Clause ("Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances.") U.S. Const., Amend. I.

In other ways, though, the Response is extremely unhelpful. For instance, his statement that he "petitioned the City government to aggrieve Perry's suspension" is incomprehensible, seemingly meaning that Plaintiff asked the City to "injure by injustice" or to "afflict with pain" Perry's suspension. It is totally unclear what the essence of this argument is but, to the extent he is arguing that the aldermen ignored his grievance letter and continued with his dismissal, he has not sufficiently pled or demonstrated how that is an actionable claim.

Thus, Plaintiff has not stated any claim upon which relief can be granted. But, as with the freedom of religion claim, even if this Court were to "*sua sponte* comb the record from the partisan perspective of an advocate for the non-moving party," Plaintiff's claim

-28-

would still fail, as he has not rebutted Defendants' evidence. First, "actions under the Petition Clause are limited to matters of public concern" and, given Plaintiff's status as an at-will employee, it is not clear that his grievance letter would qualify. *Jones v. Union Cnty., Tenn.*, 296 F.3d 417, 426 (6th Cir. 2002).[8]

Even if Plaintiff's grievance letter did address a matter of public concern, it is not clear that he was denied access to the government or the opportunity to petition for redress. The record is quite clear that neither Plaintiff nor Defendant Perry considered his "firing" to be effective when Perry told him not to return to the fire hall on June 2, 2009, as both acknowledged that Perry did not have that authority. In addition, at the June 8, 2009 hearing, Plaintiff not only had the opportunity to tell his side of the story before being dismissed, but his appearance on his own behalf was clearly more than a *pro forma* exercise; the aldermen engaged with him on the topic, his grievance letter was read into the record, and he even had a witness speak on his behalf.

Accordingly, Plaintiff has not only failed entirely to state a "freedom of speech" (or petition) claim that is plausible on its face, but he has also failed to respond substantively to Defendants' Motion for Summary Judgment as to his "freedom of speech" (or petition) claim. Further, the evidence demonstrates, to the extent the Court can discern a claim, that the evidence in the record militates entirely in favor of Defendants' argument that Plaintiff

---

[8] For instance, in *Valot v. Southeast Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1226-27 (6th Cir. 1997), the Sixth Circuit held that "[w]hile the availability of unemployment compensation is a matter of public concern, Plaintiffs' request for such benefits during the summer months while they were unemployed is far more a matter of private interest than public concern," and cited in support, among other cases, *Hoffmann v. Mayor, Councilmen and Citizens of City of Liberty*, 905 F.2d 229, 233-34 (8th Cir. 1990), for the proposition that a "grievance pursuant to city personnel rules complaining about dismissal" does not "touch a matter of public concern." In this case, therefore, as in those cases, "Plaintiff[ ] cannot make out a cause of action under the Petition Clause and [his] right-of-access claim must fail." *Id.* at 1227.

had an opportunity to seek redress of his grievances, that is, to participate in a hearing in which he discussed his grievance letter. Accordingly, Defendants' Motion for Summary Judgment (Doc. 16) will be **GRANTED** as to Plaintiff's Section 1983 "Freedom of Speech" (or Petition) claims, and those claims will be **DISMISSED WITH PREJUDICE**.

### E.    Section 1983 Conspiracy Claim

Plaintiff's Complaint only contains two allegations relating to a "conspiracy": (1) "[t]he entirety of the agents named in this law suit conspired to violate the plaintiff's civil rights in that they deprived plaintiff of his rights to [Due Process, Equal Protection, and Freedom of Religion]," and (2) "such actions and omissions on the part of all the defendants constitutes a conspiracy violation of this law and were done to deprive the Plaintiff of the following rights established under the United States Constitution: [Due Process, Equal Protection, and Freedom of Speech]." (Compl. ¶¶ 39, 48.) Presumably, Plaintiff is attempting to state a claim pursuant to 42 U.S.C. § 1985(3), but Plaintiff's pleading is so vague that even that is unclear.

It is black letter law that "conspiracy claims must be pled with some degree of specificity and . . . vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim." *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 367-68 (6th Cir. 2012) (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)). Plaintiff entirely fails to do so here, let alone to adduce any evidence on the point. Further, with the dismissal of the Section 1983 claims above, there is no underlying injury, and thus he cannot maintain a conspiracy action. "Because the substantive allegations that form the basis of [plaintiff's] conspiracy claims were properly dismissed, [his] conspiracy

counts also fail." *Beztak Land Co. v. City of Detroit*, 298 F.3d 559, 569 (6th Cir. 2002) (citing *Glassner v. R.J. Reynolds Tobacco Co.*, 223 F.3d 343, 354 (6th Cir. 2000)). *See also*, *Smith v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 829 F.2d 1126 at *3 (6th Cir. 1987) (holding that "dismissal of the § 1985 claim was also proper," where the plaintiff "presented no evidence of discrimination on the part of any of the defendants" because "[s]ince her underlying claim of discrimination failed for lack of proof, her conspiracy claim also must fail.")

Accordingly, Defendants' Motion for Summary Judgment (Doc. 16) will be **GRANTED** as to Plaintiff's Section 1983 conspiracy claims, and those claims will be **DISMISSED WITH PREJUDICE**.

### F. State Law Claims

Because the Court has dismissed all of the federal claims asserted pursuant to 42 U.S.C. § 1983 over which it had original jurisdiction, the Court can decline to exercise supplemental jurisdiction over Plaintiff's state law claims. 28 U.S.C. § 1367 provides, in pertinent part, as follows: "The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ." 28 U.S.C. § 1367(c)(3). In fact, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Gamel v. City of Cincinnati*, 625 F.3d 949, 952 (6th Cir. 2010) (quoting *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996) (internal quotation marks omitted). And while there are circumstances "where a district court should retain supplemental

jurisdiction even if all of the underlying federal claims have been dismissed" – such as where a party has engaged in forum manipulation – such circumstances are not at issue here. *Id.* (citing *Harper v. AutoAlliance Intern., Inc.*, 392 F.3d 195 (6th Cir. 2004)). Further, exercising supplemental jurisdiction does not appear to foster judicial economy and would result in needlessly resolving issues of state law. Therefore the Court will decline to retain supplemental jurisdiction over the state law claims in this case, and those claims will be **DISMISSED WITHOUT PREJUDICE**.

## IV.    CONCLUSION

Accordingly, and for the reasons stated above, Defendants' Motion for Summary Judgment (Doc. 16) will be **GRANTED** as to all Defendants. Plaintiff's federal claims – procedural due process, equal protection, freedom of speech (or petition), freedom of religion, and Section 1983 conspiracy claims are hereby **DISMISSED WITH PREJUDICE**. Pursuant to 28 U.S.C. § 1367(c), Plaintiff's state law claims – intentional infliction of emotional distress/outrage, assault, THRA, and civil conspiracy – are hereby **DISMISSED WITHOUT PREJUDICE**.

A separate judgment will enter. The Clerk is **DIRECTED** to close the file in this case.


**SO ORDERED** this 23rd day of March, 2012.


_____*/s/Harry S. Mattice, Jr.*_____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE
